## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM BORDEN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 4:23-cv-01486 |
| v. | : | |
| | : | (Judge Mehalchick) |
| MAINLINE CONVEYOR | : | |
| SYSTEMS, INC., | : | |
| Defendant | : | |

## PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN TESTIMONY OF GEORGE WHARTON

Plaintiff, William Borden, by and through his counsel, Galfand Berger, LLP, hereby files the instant Motion *in limine* to Preclude Certain Testimony and Opinions of George J. Wharton, P.E., and in support thereof, avers as follows:

1. Plaintiff initiated this action by filing a Complaint on August 10, 2023 in the Tioga County Court of Common Pleas alleging claims of negligence, strict product liability, and breach of warranty against Defendant Mainline Conveyor Systems, Inc. ("Mainline").[1]

---

[1] Plaintiff will be formally withdrawing his claims of breach of warranty and negligence and proceed at trial solely on his strict product liability design defect and failure to warn claims pursuant to the Consumer Expectations Test and Risk-Utility Test set forth in <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014).

2.  This cause of action arises out of disabling injuries suffered by Plaintiff William Borden on July 21, 2022 while in the course and scope of his employment with Tyoga Container Co. when a Mesh Belt Conveyor designed, manufactured, and installed by Defendant Mainline suddenly activated, causing him to be thrown to the ground and suffer injuries.

3.  Defendant Mainline hired George J. Wharton, a mechanical engineer, to render an opinion regarding the design of the mesh belt conveyor involved in Plaintiff's accident. Mr. Wharton authored a Report dated January 10, 2025. (Exhibit "A").

4.  In 2017, Tyoga retained Defendant Mainline to design, manufacture, and install a conveyor system to be integrated with Tyoga's production equipment. The Tyoga project was internally identified by Defendant Mainline as Project No. 17559, and formalized by MCS Quote #17657-1. (Exhibit B, MCS Quote #17657-1; Exhibit C, Dep. of Jim Raines, pp. 18-23).

5.  Defendant Mainline installed, programmed, and integrated the conveyor system in two phases in 2018. Defendant Mainline also supplied and installed the PLC system, electric panels, operator push button stations, and automatic controls for the conveyor system. (Id.).

6. Under the terms of its agreement, Defendant Mainline was also required to provide training and orientation to Tyoga personnel on the operation of the conveyor system it supplied. (Id.).

7. At the time of his accident, Plaintiff was training on the ISOWA machine, a machine that assembles, glues, and folds cardboard boxes that are then discharged in flat bundles to a Mesh Belt Conveyor that manufactured and supplied by Defendant Mainline. (Ex. C, pp. 42-47).

8. The Mesh Belt Conveyor consists of four sections, each measuring 72 inches by 5 feet and installed on 29-32" adjustable height legs. (Ex. C, pp. 35-38, 42-47; Ex. D, Photographs marked as Raines-9).

9. The first two sections are positioned at the ISOWA discharge to convey the product to a MOSCA strapper that applies a plastic strap around the bundle of stacked corrugated board before discharging to a third and fourth section. (Id).

10. The "mesh" belt is a stock product semi-perforated rubbery PVC material that is marketed to the corrugated board industry, including by Defendant Mainline, as a suitable material to avoid "creep" of uncentered loads of cardboard that could cause the material to be misaligned or fall off the conveyor edge, as well as providing to provide a safe/stable walking surface. (Exhibit E, Dep. of Terry Smith, at 89).

11. For more than a year prior to Plaintiff's accident, Tyoga personnel had established a crossover for the Mesh Belt Conveyor near the ISOWA exit feed by placing a set of yellow steps on either side as a means to access the other side of the plant as well as to retrieve boxes that fell off the "drive side" of the conveyor. (Exhibit F, Photo from Night of Accident, Exhibit G, Dep. of John Cole, p. 20, 22).

12. The ISOWA production line equipment (manufactured and installed by others) was equipped with an alarm system including audible alarms, display monitors, and flashing lights programmed on a delay that would alert workers in advance of production start-up. (Exhibit "C", Dep. of John Cole, p. 30).

13. At the time of Plaintiff's accident, the production equipment, including the ISOWA machine, was down and not in operation, meaning no product was being processed or conveyed on the line. (Exhibit H, Dep. of William Borden, p. 184).

14. Plaintiff's supervisor, Dave Irwin, instructed Plaintiff to follow him so he could show him where to retrieve a work order in a different area of the plant. (Ex. H, 128-130).

15. Mr. Irwin crossed the mesh belt conveyor from the "operator" side to the "drive" side utilizing the yellow steps with Mr. Borden following. After retrieving the work order, Plaintiff returned taking the same route. (Id.).

16. As Plaintiff was crossing back over the Mesh Belt Conveyor, however, the conveyor suddenly and unexpectedly activated without warning, causing him to be thrown from the conveyor and slice his left knee on a steel side channel before landing on the ground. (Ex. H, 128-130).

17. As supplied by Defendant Mainline, the conveyor was configured to operate in either automatic or manual modes. (Ex. C, pp. 72-76, 98-101).

18. The automatic and manual modes could be alternated via a push button station (PB 61) located on the operator side of the conveyor. (Ex. C, pp. 98-101).

19. Push button station PB 61 was not capable of deactivating, powering down, or locking out the conveyor to prevent conveyor movement, and only functioned to toggle the conveyor between automatic and manual modes. (Id.).

20. When set to automatic mode, the conveyor movement was controlled by a series of proximity sensors installed at intervals along the conveyor frame to detect product as it is discharged. (Ex. C, at 72-86).

21. As supplied and configured by Defendant Mainline, the Mesh Belt Conveyor controls were not interlocked through to the ISOWA machine, meaning that, when set to automatic mode, the conveyor could be activated automatically by triggering the sensors even if the ISOWA machine was down and no

product being processed or conveyed on the line. (Ex. C, at 110, Exhibit I, Dep. of Thor Schmidt, at 103-104, 121).

22. The Mesh Belt Conveyor lacked any independent audio or visual alarm system to warn personnel of equipment start-up. (Ex. I, 103).

23. The Mesh Belt was also supplied without any visual indicators such as a light cone to signal that the equipment was energized, or any warning decals to warn and remind workers of the hazard of sudden, automatic start-up. (Ex. I, 103, Ex. C, 120, 175-176).

24. In fact, it is undisputed that the conveyor was supplied by Defendant Mainline with zero pictorial or written warning decals or written safety instructions of any kind. (Id.).

25. There were four rotary disconnect switches along the bottom of the conveyor located only on the operator side, however the switches lacked labels to identify the "on" and "off" positions, and were not capable of fully locking out and preventing conveyor movement without a physical lock, which Defendant Mainline did not provide. (Ex. C, pp. 65-69; Ex. I, 55-58).

26. In fact, Defendant Mainline's corporate designee, Jim Raines, who was involved in designing the conveyor, reviewed a photograph of the rotary disconnect switch and admitted that he was unable to discern whether the

switch was placed in the "on" or "off" position. (Ex. C, 118-121, Exhibit "J", Raines-13).

27. Additionally, at the time of his accident, Plaintiff's employer did not have a written lockout tagout procedure for the mesh belt conveyor. (Ex. K, p. 45 & Ex. A, p. 19, fn. 4). Written procedures were developed by Tyoga in response to Plaintiff's accident. (Id.).

28. Plaintiff testified that he was never instructed on how to use the controls and did not know that the conveyor could be automatically activated by anything other than boxes being conveyed out of the ISOWA machine.

29. As for the personnel training Defendant Mainline contractually agreed to provide for Tyoga personnel, Defendant was unable to produce any documentation that the training was in fact completed for the ISOWA discharge conveyor, contrary to its policy of obtaining signed personnel training forms such as the ones that were completed for the first phase of the Tyoga project but were never completed for the second phase when the Mesh Belt Conveyor was installed at the ISOWA discharge.  (Ex. C, pp. 151-158, pp. 170-171, 173-177; Exhibit L, Exemplar Personnel Training Sign Off Forms [Raines-23]).

30. Plaintiff's have produced the Engineering Report of Daryl L. Ebersole, P.E. (Exhibit M).

31. Defendant Mainline hired Mr. Wharton, a mechanical engineer, to render an opinion regarding the design of the conveyor involved in Plaintiff's accident. Mr. Wharton authored a Report dated January 10, 2025. (Exhibit "A").

32. Mr. Wharton's Report sets forth various speculative and supported opinions that lack any basis in scientific methodology, standards, data or the factual record in this case, including, specifically:

   a. That Plaintiff's employer, Tyoga was "required" to assume liability for the safe use of the subject conveyor and training personnel pursuant to its contract with Defendant Mainline, thereby relieving Mainline of its own failure to provide the personnel training it had contractually agreed to provide. (Exhibit A, at 23-24).

   b. That Mainline was not aware of the risk of inadvertent activation of the conveyor sensors until after Plaintiff's accident because Tyoga had failed to report the issue to Mainline. (Exhibit "A", pp. 21-22, 24)

   c. That Mainline was not "required" to supply any warning of the risk of automatic startup (Exhibit "A", p. 26).

   d. That had the conveyor been equipped and sold with an audio or visual alarm system, it would have been disabled by Tyoga (Exhibit "A", p. 26).

   e. That Plaintiff's accident was the result of failing to utilize controls to deactivate the conveyor or comply with Tyoga operation and procedures that were only developed by Tyoga after Plaintiff's accident (Exhibit "A", p. 19, Figure 6 & fn. 4, pp. 27-28).

33. Mr. Wharton must be precluded from offering opinions or testimony related to the above-listed matters pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

34. Not only are Mr. Wharton's opinions based on wildly speculative and unwarranted assumptions that are directly controverted by the factual record, Mr. Wharton fails to set forth any engineering standards, data, authority, or any discernible scientific methodology that would render his opinions reliable.

35. Mr. Wharton's 28-page Report contains **zero** discussion of any supporting authority or any methodology whatsoever.

36. An expert's opinions may be deemed unreliable and precluded at trial where the expert fails to identify any methodology or supporting scientific authority for his conclusions. Mause v. Glob. Household Brands, Inc., No. CIV.A. 01-4313, 2003 WL 22416000, at *2 (E.D. Pa. Oct. 20, 2003).

37. Without setting forth a methodology or supporting authority, Mr. Wharton's opinions are nothing more than "subjective belief or unsupported speculation", an must be precluded at trial pursuant to Federal Rule of Evidence 702. Mause, at *2 (quoting Daubert).

38. Mr. Wharton's opinion that Tyoga "assumed" responsibility for operator training is factually unsupported and lacks any basis in engineering principles,

and improperly ventures into the realm of legal conclusion which Mr. Wharton is not qualified to offer.

39. Mr. Wharton is a mechanical engineer, not an expert in contract interpretation.

40. Moreover, Mr. Wharton's suggestion is inimical to Pennsylvania's strict product liability regime, which provides that a product manufacturer such as Mainline has a non-delegable duty to provide a safe product, including a duty to provide adequate warnings and instructions. Tincher v. Omega Flex, Inc., 628 Pa. 296, 383, 104 A.3d 328, 388 (Pa. 2014).

41. In this instance, Defendant Mainline contractually agreed to provide operator training to personnel at Tyoga as part of the sale of the conveyor system. As such, Mr. Wharton should be precluded from offering this unqualified opinion.

42. Mr. Wharton must also be precluded from offering testimony or opinion that the Mesh Belt Conveyor was not defective because Defendant Mainline was not aware of the risk of inadvertent or "false" activation of the Mesh Belt Conveyor or because Tyoga failed to report the issue prior to Plaintiff's accident. (Exhibit "A", pp. 21-22, 24).

43. As a threshold matter, Defendant Mainline's subjective knowledge of the potential for inadvertent activation of the mesh belt prior to Plaintiff's accident is foremost irrelevant to any of the issues to be decided by the jury

in this strict product liability cause of action. "Under the Section 402A standard, knowledge of the product's danger is imputed to the manufacturer in the design and manufacturing of the product no matter how foreseeable the defect was or how reasonable its conduct in the design and manufacture." Sullivan v. Werner Co., 2021 PA Super 66, 253 A.3d 730, 746 (2021), aff'd, 306 A.3d 846 (Pa. 2023).

44. Accordingly, Mr. Wharton must be precluded from suggesting that Defendant Mainline was required to have actual knowledge of the hazard of unintentional activation of the mesh belt conveyor.

45. Notwithstanding, Mr. Wharton's claim is directly contradicted by the testimony of Defendant Mainline's corporate representatives Jim Raines and Thor Schmidt, who admitted that Mainline both recognized that unintended or unexpected activation was a hazard presenting a risk of injury to persons on or near the conveyor, and considered the risk in designing the conveyor and associated controls. (Ex. C, 105-107, Ex. I, pp. 107-111).

46. As such, Mr. Wharton must be precluded from offering this opinion which is both unreliable and lacks basis in methodology or engineering principles.

47. Mr. Wharton's opinion that "warning about conveyors stating automatically" was "not required" is a purely subjective conclusion that is wholly unsupported by methodology or data. (Exhibit "A", p. 26). The only proffered

basis for this conclusion is Mr. Wharton's subjective and unwarranted speculation that a warning "would not have factored into [Plaintiff's] decision whether or not to cross the conveyor." (Exhibit "A", p. 26).

48. Mr. Wharton must be precluded from opining, without any factual support whatsoever, that Plaintiff would have disregarded a warning had one been provided.

49. Mr. Wharton ventures to further speculation that Plaintiff "had the knowledge that warning about conveyors starting automatically would have conveyed", without even specifying what that information would be. (Exhibit "A", p. 27).

50. Even if Mr. Wharton's opinion was not based wholly and exclusively on purely speculative claims, Mr. Wharton's opinion that Defendant Mainline's duty to supply a safe product was conditioned on a post-hoc assessment of a user's alleged subjective knowledge of a risk must nonetheless be precluded as introducing improper and inadmissible negligence concepts in this strict product liability matter. See Frintner v. TruePosition, 892 F. Supp. 2d 699, 707–08 (E.D. Pa. 2012)(trial court must ensure that jury is not exposed to unfairly prejudicial concepts, including evidence that has an undue tendency to suggest a decision on an improper basis)(citing F.R.E. 401-403).

51. Mr. Wharton must be precluded from offering purely speculative testimony that, had the conveyor been supplied and equipped with an audio or visual

alarm system, it would have been disabled by Tyoga, where there is absolutely zero factual record support for this contention. (Exhibit "A", p. 26).

52. The record is wholly devoid of any testimony or evidence that Tyoga ever had disabled an alarm system on any equipment or would have disabled an alarm system had one been supplied for the subject conveyor, and, as such, Mr. Wharton must be precluded from offering this untethered conjecture before the jury.

53. Likewise, Mr. Wharton must be precluded from offering opinions or testimony that Plaintiff failed to follow Tyoga's ISOWA instructions or "lockout" procedures. (Exhibit "A", p. 19, Figure 6 & fn. 4).

54. In his Report, Mr. Wharton references and attaches a photograph of a Tyoga written procedure for the ISOWA discharge and mesh belt conveyor and repeatedly criticizes Plaintiff for allegedly failing to follow the policy.

55. However, Mr. Wharton acknowledges in his own Report that, as confirmed by the testimony of Julie Glover who testified as a corporate designee on behalf of Tyoga Container Co., the procedures were not developed until *after* Plaintiff's accident. (Exhibit "A", p. 19, Figure 6 & fn. 4; Exhibit K, p. 45).

56. Plaintiff testified at deposition that he had never seen the document previously and was not familiar with its contents. (Ex. H, pp. 161-62).

57. The above opinions and testimony are precisely the type of speculative, unsupported non-expert opinions that a proffered expert must be prevented from offering to the jury under the precedent of Daubert and its progeny.

58. Mr. Wharton fails to identify a methodology, industry standard, data, or authority in support of any of the above opinions, or, for that matter, throughout the length of his 28-page Report.

59. Without a methodology or a shred of scientific or engineering support, Mr. Wharton's opinions are precisely the type of "subjective belief or unsupported speculation" which a proffered expert must be prevented from offering to the jury under the precedent of Daubert and its progeny.

60. Accordingly, pursuant to the standard set forth in Daubert and Federal Rule of Evidence 702, Plaintiff respectfully moves this Honorable Court to enter an Order in the attached form precluding Mr. Wharton from offering unqualified and unsupported opinions at trial.

WHEREFORE, for the reasons set forth herein at length and in the accompanying Memorandum of Law filed contemporaneously with this Motion, Plaintiff respectfully requests this Honorable Court grant his Motion *in limine* to preclude George J. Wharton from testifying as to certain unqualified and unsupported opinions at trial by entering an Order in the attached form.

**GALFAND BERGER, LLP**

BY:    */s/ Brooke J. Elmi*
         BROOKE J. ELMI, ESQUIRE
         PA ID # 325999
         1835 Market Street, Suite 2710
         Philadelphia, PA  19103
Date: 06/23/2025         belmi@galfandberger.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM BORDEN, | : | CIVIL DIVISION |
| | : | |
| Plaintiff, | : | No. 4:23-cv-01486 |
| v. | : | |
| | : | |
| MAINLINE CONVEYOR | : | |
| SYSYTEMS, INC., | : | |
| Defendant | : | |

## CERTIFICATE OF SERVICE

I, Brooke J. Elmi, Esquire, hereby certify that on this 23rd day of June, 2025, I caused the foregoing Motion *in Limine* to Preclude Certain Testimony of George J. Wharton to be served via ECF Notification following:


Brian S. Kane, Esquire
Gordon Rees Scully Mansukhani
707 Grant Street, Suite 3800
Pittsburgh, PA 15219
**Via e-mail**: bkane@grsm.com
***Counsel for Defendant Mainline Conveyor Systems, Inc.***

              **GALFAND BERGER, LLP**

        BY:   */s/ Brooke J. Elmi*
              BROOKE J. ELMI, ESQUIRE
              PA ID # 325999
              1835 Market Street, Suite 2710
              Philadelphia, PA  19103
Date: 06/23/2025        belmi@galfandberger.com

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM BORDEN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 4:23-cv-01486 |
| v. | : | |
| | : | (Judge Mehalchick) |
| MAINLINE CONVEYOR | : | |
| SYSTEMS, INC., | : | |
| Defendant | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION *IN LIMINE* TO PRECLUDE CERTAIN TESTIMONY AND
OPINIONS OF GEORGE J. WHARTON PURSUANT TO F.R.E. 702 AND
*DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.*__**

## I.    MATTER BEFORE THE COURT

Before this Honorable Court is Plaintiff's Motion *in Limine* to preclude certain testimony and opinions of Defendant Mainline's liability expert, George J. Wharton, which are speculative and lack basis in any scientific methodology. Mr. Wharton makes no use of any scientific methodology, testing, or applicable industry standards and regulations to support his opinions. Rather, Mr. Wharton simply draws broad and unsupported conclusions that lack basis in the factual record or appropriate engineering principles, amounting to nothing more than mere conjecture and subjective personal belief. (Exhibit "A", Report of George J. Wharton). Consequently, Mr. Wharton's testimony on these matters must be excluded pursuant to Rule 702 of the Federal Rules of Evidence, Daubert v. Merrell Dow

1

Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

## II.    PROCEDURAL HISTORY

Plaintiff initiated this action by filing a Complaint on August 10, 2023 in the Tioga County Court of Common Pleas alleging claims of negligence, strict product liability, and breach of warranty against Defendant Mainline Conveyor Systems, Inc. ("Mainline"). The case was subsequently removed by Defendant to the United States District Court for the Middle District of Pennsylvania. Trial is scheduled to begin on August 11, 2025. Pursuant to this Court's Order of April 1, 2025, all motions *in limine* are to be filed by June 23, 2025.

## III.    QUESTIONS PRESENTED

1. Should Defendant's expert, George J. Wharton, be precluded from rendering certain opinions that are based on assumptions contrary to established fact and which Mr. Wharton has failed to set forth any supporting scientific methodology, engineering principles, data, regulations, or testing?

Suggested Answer: YES

## IV.    STATEMENT OF FACTS

At the time of his accident of July 21, 2022, Plaintiff William Borden was employed at Tyoga Container Co. ("Tyoga"), a manufacturer of corrugated board packaging products.

In 2017, Tyoga retained Defendant Mainline to design, manufacture, and install a conveyor system to be integrated with Tyoga's production equipment. The

Tyoga project was internally identified by Defendant Mainline as Project No. 17559, and formalized by MCS Quote #17657-1. (Exhibit B, MCS Quote #17657-1; Exhibit C, Dep. of Jim Raines, pp. 18-23). Defendant Mainline installed, programmed, and integrated the conveyor system in two phases in 2018. Defendant Mainline also supplied and installed the PLC system, electric panels, operator push button stations, and automatic controls for the conveyor system. (Id.). Under the terms of its agreement, Defendant Mainline was also required to provide training and orientation to Tyoga personnel on the operation of the conveyor system it supplied. (Id.).

At the time of his accident, Plaintiff was training on the ISOWA machine, a machine that assembles, glues, and folds cardboard boxes that are then discharged in flat bundles to a Mesh Belt Conveyor that manufactured and supplied by Defendant Mainline. (Ex. C, pp. 42-47). The Mesh Belt Conveyor consists of four sections, each measuring 72 inches by 5 feet and installed on 29-32" adjustable height legs. The first two sections are positioned at the ISOWA discharge to convey the product to a MOSCA strapper that applies a plastic strap around the bundle of stacked corrugated board before discharging to a third and fourth section. (Ex. C, pp. 35-38, 42-47; Ex. D, Photographs Marked as Raines-9).

The "mesh" belt is a stock product semi-perforated rubbery PVC material that is marketed to the corrugated board industry, including by Defendant Mainline, as a suitable material to avoid "creep" of uncentered loads of cardboard that could cause

3

the material to be misaligned or fall off the conveyor edge, as well as providing to provide a safe/stable walking surface. (Exhibit E, Dep. of Terry Smith, at 89).

For more than a year prior to Plaintiff's accident, Tyoga personnel had established a crossover for the Mesh Belt Conveyor near the ISOWA exit feed by placing a set of yellow steps on either side as a means to access the other side of the plant as well as to retrieve boxes that fell off the "drive side" of the conveyor. (Exhibit F, Photo from Night of Accident, Exhibit G, Dep. of John Cole, p. 20, 22). The ISOWA production line equipment (manufactured and installed by others) was equipped with an alarm system including audible alarms, display monitors, and flashing lights programmed on a delay that would alert workers in advance of production start-up. (Exhibit G, Dep. of John Cole, p. 30).

At the time of Plaintiff's accident, the production equipment, including the ISOWA machine, was down and not in operation, meaning no product was being processed or conveyed on the line. (Exhibit H, Dep. of William Borden, p. 184).

Plaintiff's supervisor, Dave Irwin, instructed Plaintiff to follow him so he could show him where to retrieve a work order in a different area of the plant. Mr. Irwin crossed the mesh belt conveyor from the "operator" side to the "drive" side utilizing the yellow steps with Mr. Borden following. After retrieving the work order, Plaintiff returned taking the same route. As Plaintiff was crossing back over the

4

Mesh Belt Conveyor, however, the conveyor suddenly and unexpectedly activated without warning, causing him to be thrown from the conveyor and slice his left knee on the steel channel along the side of the conveyor. (Ex. H, 128-130).

The Mesh Belt Conveyor was configured to operate in either automatic or manual modes. (Ex. C, pp. 72-76, 98-101). The automatic and manual modes could be alternated via a push button station (PB 61) located on the work side of the conveyor. (Ex. C, pp. 98-101). Push button station PB 61 was not capable of deactivating, powering down, or locking out the conveyor to prevent conveyor movement, and only functioned to toggle the conveyor between automatic and manual modes. (Id.). When set to automatic mode, the conveyor movement was controlled by a series of proximity sensors installed at intervals along the conveyor frame to detect product as it is discharged. (Ex. C, at 72-86).

As supplied and installed by Defendant Mainline, the Mesh Belt Conveyor controls were not interlocked through to the ISOWA machine, meaning that, when set to automatic mode, the conveyor could be activated automatically by triggering the sensors even if the ISOWA machine was down and no product being processed or conveyed on the line. (Ex. C, at 110, Exhibit I, Dep. of Thor Schmidt, at 103-104, 121).

Unlike the ISOWA, the Mesh Belt Conveyor also lacked any independent audio or visual alarm system to warn personnel of the equipment start-up. (Ex. I, 103). The Mesh Belt was also supplied without any visual indicators such as a light cone to signal that the equipment was energized, or any warning decals to warn and remind workers of the hazard of sudden, automatic start-up. In fact, it is undisputed that the conveyor was supplied by Defendant Mainline with zero pictorial or written warning decals or written safety instructions of any kind. (Ex. I, 103, Ex. C, 120, 175-176).

There were four rotary disconnect switches along the bottom of the conveyor located only on the operator side, however the switches lacked labels to identify the "on" and "off" positions, and were not capable of fully locking out and preventing conveyor movement without a physical lock, which Defendant Mainline did not provide. (Ex. C, pp. 65-69; Ex. I, 55-58). In fact, Defendant Mainline's corporate designee, Jim Raines, who was involved in designing the conveyor, reviewed a photograph of the rotary disconnect switch and admitted that he was unable to discern whether the switch was placed in the "on" or "off" position. (Ex. C, 118-121, Exhibit "J", Raines-13). At the time of his accident, Plaintiff's employer did not have a written lockout tagout procedure for the mesh belt conveyor. (Ex. K, p. 45 & Ex. A, p. 19, fn. 4). Written procedures were developed by Tyoga in response to Plaintiff's accident. (Id.).

As for the personnel training Defendant Mainline contractually agreed to provide for Tyoga personnel, Mainline was unable to produce any documentation that the training was in fact completed for the ISOWA discharge conveyor, contrary to its policy of obtaining signed personnel training forms such as the ones that were completed for the first phase of the Tyoga project but were never completed for the second phase when the Mesh Belt Conveyor was installed at the ISOWA discharge. Defendant Mainline was unable to produce any records demonstrating what would have been covered during the personnel training had it in fact been done, but confirmed the training would have included instruction on the controls and safe operation. (Ex. C, pp. 151-158, pp. 170-171, 173-177; Exhibit L, Exemplar Personnel Training Sign Off Forms [Raines-23]).

As detailed in the expert Engineering Report of Daryl L. Ebersole, P.E., the Mesh Belt Conveyor was defective and unsafe due to the hazard of unintended and unexpected start-up of the conveyor movement, which posed a risk of injury to workers on or near the conveyor. (Exhibit M, Report of Daryl Ebersole, P.E.).  Mr. Ebersole opines that safer alternative designs included supplying a structural crossover with an independent stop control, which would allow workers to safely deenergize and prevent conveyor movement before crossing, or interlocking the conveyor through to the ISOWA.

## **REPORT OF GEORGE J. WHARTON**

Defendant Mainline hired Mr. Wharton, a mechanical engineer, to render an opinion regarding the design of the conveyor involved in Plaintiff's accident. Mr. Wharton authored a Report dated January 10, 2025. (Exhibit "A").

Mr. Wharton's Report sets forth various speculative and supported opinions that lack any basis in scientific methodology, standards, data or the factual record in this case, including, specifically:

1. That Plaintiff's employer, Tyoga was "required" to assume liability for the safe use of the subject conveyor and training personnel pursuant to its contract with Defendant Mainline, thereby relieving Mainline of its own failure to provide the personnel training it had contractually agreed to provide. (Exhibit A, at 23-24).

2. That Mainline was not aware of the risk of inadvertent activation of the conveyor sensors until after Plaintiff's accident because Tyoga had failed to report the issue to Mainline. (Exhibit "A", pp. 21-22, 24)

3. That Mainline was not "required" to supply any warning of the risk of automatic startup (Exhibit "A", p. 26).

4. That had the conveyor been equipped and sold with an audio or visual alarm system, it would have been disabled by Tyoga (Exhibit "A", p. 26).

5. That Plaintiff's accident was the result of failing to utilize controls to deactivate the conveyor or comply with Tyoga operation and procedures that were only developed by Tyoga after Plaintiff's accident (Exhibit "A", p. 19, Figure 6 & fn. 4, pp. 27-28).

## V.    <u>ARGUMENT</u>

### A.  LEGAL STANDARD

An expert's testimony must conform to the requirements of Rule 702 of the Federal Rules of Evidence in order to be admissible. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

These requirements have been termed the "trilogy of restrictions" and have been described more concisely as qualification, reliability, and fit. Calhoun v. Yamaha Motor Corp., 351 F.3d 316, 321 (3d Cir. 2003). The second prong requires the expert's testimony to be reliable by a preponderance of the evidence and supported by "methods and procedures of science" rather than on "subjective belief or unsupported speculation." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), cert denied 513 U.S. 1190 (1995) ("Paoli II"). This burden requires more than a *prima facie* showing that the expert's methods and procedures are reliable. Paoli II, 35 F.3d at 743-44. Lastly, the expert's testimony must be both relevant for the purposes of the case and assist a jury in determining the facts of the case. Calhoun, 351 F.3d at 321.

District Courts must act as "gatekeepers" in ensuring that expert testimony is reliable, relevant, and helpful to the jury. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). The trial judge must determine that any and all scientific testimony or evidence is not only relevant, but reliable. Daubert, 509 U.S. at 589. Scientific knowledge requires an opinion be derived from scientific method and supported by "appropriate validation" or "good grounds." Id. at 590. The reasoning and gatekeeping requirement of Daubert has been extended to the testimony of engineers and other experts who are not scientists, like Mr. Wharton. Kumho Tire, 526 U.S. at 141.

An expert's testimony must rest on a reliable foundation of methodology and physical evidence and be relevant to the particular facts of the case. Daubert, 509 U.S. at 597.  To be reliable, an expert's opinion must be based on scientific methods and procedures, **not** merely on "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590; There cannot be too great a gap between the physical evidence and the opinion proffered. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

An expert's opinions may be deemed unreliable and precluded at trial where the expert fails to identify any methodology or supporting scientific authority for his conclusions. Mause v. Glob. Household Brands, Inc., No. CIV.A. 01-4313, 2003 WL 22416000, at *2 (E.D. Pa. Oct. 20, 2003).

In the present matter, Mr. Wharton's Report contains various wildly speculative assumptions that are directly controverted by the factual record, and fails to set forth any engineering standards, data, authority, or any discernible scientific methodology that would render his opinions reliable. Indeed, Mr. Wharton's 28-page Report contains **<u>zero</u>** discussion of supporting authority and fails to identify any methodology whatsoever.[1] Without setting forth a methodology or supporting authority, Mr. Wharton's opinions are nothing more than subjective belief or unsupported speculation, and must be precluded at trial pursuant to F.R.E. 702. <u>Mause</u>, at *2 (quoting <u>Daubert</u>).

1. **Mr. Wharton's opinion that Plaintiff's employer was "required" to assume liability for the safety of Defendant's conveyor and training of personnel pursuant to its Purchase Quote with Defendant Mainline**

Mr. Wharton must be precluded from offering his non-expert opinion Plaintiff's employer was "required" to or did assume liability for the safety of Defendant's conveyor and training of personnel pursuant to its Purchase Quote with Defendant Mainline. (Exhibit "A", pp. 23-24).

---

[1] The singular reference to any authority in Mr. Wharton's Report is to a publication by CEMA (Conveyor Equipment Manufacturers Association) which Mr. Wharton makes passing reference to in his criticism of Plaintiff's expert's opinions. Mr. Wharton does not cite the publication (or any publication, industry standard, or government regulation whatsoever) as a basis for his own opinions, and does not address Mr. Ebersole's substantive conclusions relying on the CEMA publication as evidence of the conveyor manufacturing industry's broad awareness of the need to provide crossovers and available safe crossover systems, but merely claims that the plastic yellow steps implemented by Tyoga as a crossover for the mesh belt conveyor was not consistent with the type of crossover depicted in the CEMA publication. (Exhibit "A", pp. 20-21).

Mr. Wharton's opinion that Tyoga "assumed" responsibility for operator training is factually unsupported and lacks any basis in engineering principles, and improperly ventures into the realm of legal conclusion which Mr. Wharton is not qualified to offer. Mr. Wharton is a mechanical engineer, not an expert in contract interpretation. Moreover, Mr. Wharton's suggestion is inimical to Pennsylvania's strict product liability regime, which provides that a product manufacturer such as Mainline has a non-delegable duty to provide a safe product, including a duty to provide adequate warnings and instructions. Tincher v. Omega Flex, Inc., 628 Pa. 296, 383, 104 A.3d 328, 388 (Pa. 2014).

**2. Mr. Wharton's opinion that Defendant Mainline was not aware of the risk of inadvertent activation of the Mesh Belt Conveyor prior to Plaintiff's accident because Plaintiff's employer failed to report the issue**

Mr. Wharton must be precluded from offering testimony or opinion that the Mesh Belt Conveyor was not defective because Defendant Mainline was not aware of the risk of inadvertent or "false" activation of the Mesh Belt Conveyor or because Tyoga failed to report the issue prior to Plaintiff's accident. (Exhibit "A", pp. 21-22, 24).

Defendant Mainline's subjective knowledge of the potential for inadvertent activation of the mesh belt prior to Plaintiff's accident is foremost irrelevant to any of the issues to be decided by the jury in this strict product liability cause of action. "Under the Section 402A standard, knowledge of the product's danger is imputed to

the manufacturer in the design and manufacturing of the product no matter how foreseeable the defect was or how reasonable its conduct in the design and manufacture." Sullivan v. Werner Co., 2021 PA Super 66, 253 A.3d 730, 746 (2021), aff'd, 306 A.3d 846 (Pa. 2023).

Notwithstanding, Mr. Wharton's claim is directly contradicted by the testimony of Defendant Mainline's corporate representatives Jim Raines and Thor Schmidt, who admitted that Mainline both recognized that unintended or unexpected activation was a hazard presenting a risk of injury to persons on or near the conveyor, and considered the risk in designing the conveyor and associated controls. (Ex. C, 105-107, Ex. I, pp. 107-111).

As such, Mr. Wharton must be precluded from offering this opinion which is both unreliable and lacks basis in methodology or engineering principles.

**3. Mr. Wharton's opinion that Defendant Mainline was not "required" to provide warning decals to caution of the risk of automatic activation of the Mesh Belt Conveyor**

Mr. Wharton's opinion that "warning about conveyors stating automatically" was "not required" is a purely subjective conclusion that is wholly unsupported by methodology or data. (Exhibit "A", p. 26). The only proffered basis for this conclusion is Mr. Wharton's subjective and unwarranted speculation that a warning "would not have factored into [Plaintiff's] decision whether or not to cross the conveyor." (Exhibit "A", p. 26). Mr. Wharton must be precluded from opining,

without any factual support whatsoever, that Plaintiff would have disregarded a warning had one been provided, and improperly suggest to the jury that a manufacturer's duty to supply a safe product is based on a post-hoc assessment of the subjective knowledge of the ultimate user, in direct contravention to Pennsylvania strict product liability law. Further, Mr. Wharton's suggestion that Plaintiff would not have heeded a warning if provided is not a proper subject for "expert" opinion, and lacks any factual record support whatsoever.

## 4. That had the conveyor been equipped and sold with an audio or visual alarm system it would have been disabled by Tyoga

Mr. Wharton must be precluded from offering purely speculative testimony that, had the conveyor been supplied and equipped with an audio or visual alarm system, it would have been disabled by Tyoga, where there is absolutely zero factual record support for this contention. (Exhibit "A", p. 26). The record is wholly devoid of any testimony or evidence that Tyoga ever had disabled an alarm system on any equipment or would have disabled an alarm system had one been supplied for the subject conveyor, and, as such, Mr. Wharton must be precluded from offering this untethered conjecture before the jury.

## 5. Testimony or opinions relying on a Tyoga operation and lockout procedure that was developed after Plaintiff's accident

In his Report, Mr. Wharton references and attaches a photograph of a Tyoga written procedure for the ISOWA discharge and mesh belt conveyor and repeatedly

criticizes Plaintiff for allegedly failing to follow the policy, despite admitting in his own Report that the procedure was not developed until **after** Plaintiff's accident. (Exhibit "A", p. 19, Figure 6 & fn. 4). Plaintiff testified at deposition that he had never seen the document previously and was not familiar with its contents. (Ex. H, pp. 161-62).

Mr. Wharton fails to identify a methodology, industry standard, data, or authority in support of any of the above opinions, or, for that matter, throughout the length of his 28-page Report. Without a methodology or a shred of scientific or engineering support, Mr. Wharton's opinions are precisely the type of "subjective belief or unsupported speculation" which a proffered expert must be prevented from offering to the jury under the precedent of Daubert and its progeny.

## VI.    CONCLUSION

For the reasons set forth herein at length, Plaintiff respectfully requests this Honorable Court grant Plaintiff's motion *in limine* by entering an Order in the attached form.

**GALFAND BERGER, LLP**

BY:    */s/ Brooke J. Elmi*
          BROOKE J. ELMI, ESQUIRE
          PA ID # 325999
          1835 Market Street, Suite 2710
          Philadelphia, PA 19103
Date: 06/23/2025          belmi@galfandberger.com

15